The **FABBRI CO., Inc.,** Plaintiff,

v.

**UNIVERSAL SHIPPING CORPORATION,** Defendant and Third-Party Plaintiff,

v.

**John W. McGRATH CORPORATION,** Third-Party Defendant.

**No. 65 AD 274.**

United States District Court, S. D. New York.

July 31, 1969.

Seymour Simon, New York City, for plaintiffs.

Hill, Rivkins, Warburton, McGowan & Carey, New York City, for defendant; Gray Williams, New York City, of counsel.

Macklin, Hanan & McKernan, New York City, for third-party defendant; T. A. Hanan, New York City, of counsel.

## FINDINGS, CONCLUSIONS AND DECISION

FRANKEL, District Judge.

This is an action for damage, by deep rusting and bending, to a cargo of 45 lifts or bundles of electrically welded steel tubes. After trial without a jury, the court states its findings and conclusions, in accordance with Fed.R.Civ.P. 52(a), as follows:

### I.

■ Plaintiff, The Fabbri Co., Inc., as consignee of the shipment and owner of the goods, is entitled to maintain the suit. Defendant Universal Shipping Corporation (Universal), the carrier, is sued under the familiar rules of the Carriage of Goods by Sea Act of 1936, 46 U.S.C. § 1300 et seq., and the Harter Act of 1893, 46 U.S.C. § 190 et seq. John W. McGrath Corporation is here as third-party defendant. There is no claim by plaintiff against McGrath, but a claim by Universal for indemnity in the event plaintiff is held entitled to recover.

The 45 lifts in question contained a total of some 300,000 feet of welded steel tubing in pieces about 20 feet long. Each bundle contained something over 300 pieces and was approximately ten inches in diameter. The ends of each bundle were wrapped in burlap, but the bundles were not otherwise covered. At the time of their receipt by Universal at Antwerp for carriage to New York aboard its vessel, the Shiraz, the surfaces of the tubes were smooth, shiny, and coated with a film of light oil to prevent rusting. The carrier issued its bill of lading acknowledging the "apparent good order and condition" of the cargo.[1]

The shipment was discharged at the Port of New York on or shortly before June 24, 1964. Universal engaged McGrath to unload and store the cargo pending delivery to plaintiff. McGrath maintained both open and sheltered storage facilities. Under the course of dealing between Universal and McGrath, goods off-loaded and stored by the latter were kept in the open and left uncovered except in instances when the carrier gave orders for more expensive storage in enclosed installations or requested covering. In the case at hand, receiving no special instructions from Universal, McGrath placed the bundles of tubing in an unsheltered storage area without covering.

After the cargo of the Shiraz had been unloaded and stored by McGrath, Department of Agriculture inspectors found it infested with khapra beetles and ordered fumigation. The evidence does not indicate which of the things the ship had carried—including flax waste, tin plate, and various kinds of steel—had brought the insects aboard in the first place. There is no basis for supposing that the cargo here in question served that function.

The business of arranging and completing the work of disinfestation delayed delivery of the several cargoes to their consignees. None of the parties to the present suit is at fault for the delay as such. The delay is significant, however, because there was a considerable amount of rain during the period of almost a month when the bundles of steel tubes lay in the open. The rains, the evidence shows, washed away the oil film from large portions of the tubes, causing deep rusting and pitting where the protective coating was thus removed. When the bundles were finally delivered to plaintiff, on July 20–22, 1964, their tops and outer portions were the most damaged areas. Lesser, but still extensive, damage of the same kind extended down among the interior pieces, marking the course of infiltration and destruction by the rain water. About 60 of the tubes were further damaged in that they had been bent.

The steel tubes had been designed and imported for use in the manufacture of furniture. The damage by rusting and pitting rendered them unserviceable for this or any other purpose approximating that relatively valuable intended use. And they were not salvageable for any such use. Plaintiff was forced to sell the entire shipment to a scrap dealer for a total of $400.

As against that salvage value, plaintiff had paid a total of $11,290.64 for the shipment of steel tubes, made up of the following components:

| | |
|---|---:|
| Price paid European seller | $ 9,859.68 |
| 10% ad valorem duty | 985.96 |
| Freight forwarder's charges | 45.00 |
| Trucking to Stamford, Conn. | 400.00 |
| | $11,290.64 |

1. The Court's findings as to the condition of the goods when lifted rest in part upon the bill of lading, but also upon the inferences drawn from their damaged condition upon delivery to plaintiff.

This total cost, leaving plaintiff with an out-of-pocket loss of $10,890.64 after receipt of the $400 from the scrap dealer, was substantially less than the fair market value of the same goods at either New York City or Stamford at the time here in question.

## II.

Upon the foregoing findings, required by the evidence in the case, familiar principles lead to obvious conclusions.

■ In fairly standard terms, it may be said on the record as a whole that plaintiff made its prima facie case by proving (1) the carrier's receipt of the cargo in sound condition (2) delivery to plaintiff in the substantially worthless state hereinabove described,[2] and (3) the amount of loss thus sustained. M. W. Zack Metal Company v. S. S. Birmingham City, 311 F.2d 334, 337 (2d Cir. 1962), cert. denied, 375 U.S. 816, 84 S.Ct. 50, 11 L.Ed.2d 51 (1963); Mamiye Bros. v. Barber Steamship Lines, Inc., 241 F.Supp. 99, 111–112 (S.D.N.Y.1965), aff'd, 360 F.2d 774 (2d Cir.), cert. denied, 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70 (1966). In this formulation, the sound condition of the goods when received by the carrier might be deemed established by the acknowledgment in the bill of lading in light of the nature of the cargo, Copco Steel & Eng. Co. v. The Prins Willem Van Oranje, *supra* at 83–84, notwithstanding defendant's insistence that it acknowledged only "apparent [external] good order and condition * *."

■ But there is no need to stay with that slightly debatable conclusion. As has been noted, the evidence of the condi-

tion of the bundles upon delivery to the plaintiff—showing the spread of the damage along courses found by the rain water and the islands of steel still shiny and oiled where the water had not penetrated—generates a persuasive inference back to the undamaged state of the tubes before their exposure to the rains. See Elia Salzman Tobacco Co. v. S. S. Mormacwind, 371 F.2d 537, 539 (2d Cir. 1967); Levatino Company v. M/S Helvig Torm, 295 F.Supp. 725, 730 n. 16 (S.D. N.Y.1968).

Pursuing the alternative but ultimately identical routes to the result, defendant is liable whether the ground be stated as (1) its failure to overcome the prima facie case by proving an "excepted cause" or "due diligence," e. g., Caterpillar Overseas, S. A. v. S. S. Expeditor, 318 F.2d 720, 724–725 (2d Cir.), cert. denied, American Export Lines v. Caterpillar Overseas, 375 U.S. 942, 84 S.Ct. 347, 11 L.Ed.2d 272 (1963); Isthmian Steamship Co. v. California Spray-Chemical Corp., 290 F.2d 486, 489–490 (9th Cir. 1961), or (2) the demonstration that defendant was negligent in caring for the cargo before delivery. The record sustains both versions, and both are adopted as grounds for the judgment to be rendered for plaintiff against defendant Universal.

■■ In performing its service as a carrier, Universal was bound to know and to follow required precautions for avoiding damage to, or destruction of, the property entrusted to it for safe carriage and delivery. Anderson v. Lorentzen, 160 F.2d 173, 175 (2d Cir. 1947); Levatino Company v. American

---

2. There has been some gingerly effort by the defense to suggest reliance upon the standard provision in the bill of lading that "superficial rust, oxidation or any like condition due to moisture is not a condition of damage and acknowledgment of the receipt of the goods in apparent good order and condition is not a representation that such conditions of rust, oxidation and the like did not exist on receipt." The findings, reflecting the evidence, are that the severe rust substantially destroying the tubes occur-

red as a result of events long after lifting. The damage is unrelated to any "superficial rust" which may or may not have existed at the time of delivery to the carrier and which would not, in any event, have impaired the essential soundness of the cargo. Cf. Copco Steel & Eng. Co. v. The Prins Willem Van Oranje, 159 F.Supp. 79, 82, 83, 90 (E.D. Mich.1957); Copco Steel & Eng. Co. v. The Prins Frederik Hendrik, 129 F.Supp. 469, 471 (E.D.Mich.1955).

President Lines, Ltd., 233 F.Supp. 697, 701 (S.D.N.Y.), aff'd, 337 F.2d 729 (2d Cir. 1964). The duty could not be shed by delegation. Isthmian Steamship Co. v. California Spray-Chemical Corp., *supra*, 290 F.2d at 490; Mamiye Bros. v. Barber Steamship Lines, Inc., *supra*, 241 F.Supp. at 107. The duty continued until "proper delivery" of the goods to plaintiff. Caterpillar Overseas, S. A. v. S. S. Expeditor, *supra*, 318 F.2d at 724. It was breached by leaving the tubes exposed to the weather for close to a month, during which time the rains caused the destruction of the cargo.

 Not only was Universal's duty to plaintiff nondelegable; in the circumstances of this case, its liability is nontransferable. There is no ground for the claim of indemnity from McGrath. The applicable principle is that of "the ordinary case" in which "the undertaking of one who renders services in the practice of a profession or trade is a matter of contract between the parties, and the terms of the undertaking are either stated expressly, or implied as a matter of the understanding." Restatement (Second) of Torts § 299A, comment c (1965). The evidence, while it is not overwhelming either way, indicates a bare preponderance that Universal and McGrath, *inter se*, had agreed in effect to a division of risk and responsibility which absolves the latter. In the absence of specific instructions from Universal, McGrath was to supply storage in open places, without covering. Only when directed to do so, and for a higher fee, was McGrath obliged to supply shelter or covering. Given this agreed division of responsibility, and its direct relation to the central matter of price for McGrath's service, the respective rights and duties of these parties become reasonably clear for our purposes. McGrath was under no obligation to Universal to determine the need for protection of any given cargo. Universal determined when

to forego the benefits of protected storage and thus to enjoy the accompanying savings in its payments to McGrath. The claim for indemnity must fail.

As to the measure of damages, plaintiff briefs alternative theories and possible totals ranging up to about $17,000, overlooking its explicit concession at trial that its claim should not exceed a maximum measured from its cost of the goods. Upon the findings, including the calculation, stated earlier, this maximum will be awarded. In addition, plaintiff will recover interest at the rate of six percent from July 22, 1964.[3]

Judgment will be entered (1) awarding a recovery to plaintiff against Universal of $10,890.64 with interest at six percent from July 22, 1964, plus costs, and (2) dismissing Universal's third-party complaint, with costs to McGrath.

---

3. Nobody questions the court's power to award such interest. Petition of City of New York, 332 F.2d 1006, 1007–1008 (2d Cir. 1964). Defendant appeals to discretion for a different ruling. The appeal is not moving. The long delay in paying this claim was not strongly defensible.